### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| EMMITT NEAL, JR. and PAULA NEAL | ) | Bankruptcy No.  12 B 26305 |
| | ) | |
| Debtors, | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### ON BRENDAN FINANCIAL'S
### OBJECTION TO CONFIRMATION OF DEBTORS' PLAN

Debtors filed jointly for bankruptcy relief under Chapter 13. Creditor, Brendan Financial,

Inc. ("Brendan"), objects to confirmation of the pending modified Chapter 13 Plan asserting that

its filing was in bad faith under 11 U.S.C. § 1325(a)(3). It alleges failure to pay Brendan the

statutorily required payments due to secured creditors, and for asserted material misstatements of

the Debtors' income and assets. Pre-petition, Brendan held a junior mortgage on Debtor's

residence in Maywood, Illinois. However, in a related adversary proceeding based on the

property value, Brendan was adjudged to be wholly unsecured, and thus not entitled to a secured

claim in this bankruptcy case. That ruling is contingent on Plan confirmation and completion of

the Plan through Debtors' discharge.

Debtor's Plan was objected to on the following grounds:

1.    The pending Plan proposes no payment to Brendan's secured interest and does not
propose to surrender the security.

2.    The Plan proposes to strip off the Brendan lien.

The foregoing objections were asserted to violate 11 U.S.C. § 1322(b) and 1322(b)(2),

respectively.

3.      Brendan also objected under § 1325(b) that Debtors' schedules of income and property value were materially understated.

In related Adversary proceeding No. 12 A 1594, Debtors obtained a Judgment "stripping" (i.e. reducing to zero) the value of Brendan's secured lien on October 28, 2013. Debtor's Plan is consistent with that Judgment in failing to offer payment on Brendan's secured claim, and the first two objections to confirmation were thereby mooted.

The remaining issue is whether Debtors did or did not fail in material ways to disclose in their bankruptcy schedules truthful amounts of income available for Plan payments, and properties they owned. If that were true, and the Plan was thereby filed in bad faith, confirmation of the Plan would be denied.

The parties on each side have much at stake. If Debtors' Plan fails for bad faith, they may not under applicable precedent be able to cure the problems complained of. *See Payne v. Wood*, 775 F.2d 202, 205 (7th Cir., 1985). Also, if Debtors' case were then dismissed and bankruptcy relief denied, Brendan's second lien would then be retained, and the Debtors would likely lose their home and still owe all their debts in full.

Trial was held and evidence taken. Following trial, the parties filed proposed Findings of Fact and Conclusions of Law and thereby presented their arguments in writing. Having heard the testimony of the witnesses and considered the documentary evidence presented by the parties and their written argument, the Court now makes and enters the following Findings of Fact and Conclusions of Law.

Many of the fact Findings proposed by each party are not contested and except for some details are in accord with the evidence, so those Findings proposed by each party were largely

adopted and made as part of the Court's Findings to the extent set forth below. The main issue

presented here is not over facts, but what the facts mean under legal standards for deciding

whether the proposed Plan was or was not filed in bad faith.

## FINDINGS OF FACT

### Findings of Fact Proposed by Debtors and Adopted by the Court

#### The Debtors

1.      Emmitt Neal and Paula Neal are husband and wife ("Neals"). (Trial Trans. 127:

13-16.) The Neals have been married for 6 years. (Trial Trans. 127:21-23.) The Neals are the

joint owners of their residence located at 1206 S. 1st Ave., Maywood, IL 60153. (Joint Stipulation

¶ 19.)

2.      Mr. Neal has a high school diploma and some post-secondary education but does

not have a college degree. (Joint Stipulation ¶ 2.) Mr. Neal is neither highly educated nor

sophisticated.

3.      Mrs. Neal has a high school diploma and some post-secondary education but does

not have a college degree. (Joint Stipulation ¶ 3.) Mrs. Neal is neither highly educated nor

sophisticated.

4.      The Neals are the Debtors in this bankruptcy case. (Joint Stipulation ¶¶ 2-3.) The

Neals have three children who live with them. (Trial Trans. 128:1-4.)

5.      This is Mr. Neal's first bankruptcy case. (Joint Stipulation ¶¶ 4-5.)

**Mrs. Neal's Prior Case**

6.       Mrs. Neal filed a prior Chapter 13 petition on September 30, 2011. (Joint

Stipulation ¶ 5.)  Mrs. Neal obtained confirmation of her prior plan on January 26, 2012. (Joint

Stipulation ¶ 6.)  The confirmed plan in the prior case provided that Mrs. Neal was to make

ongoing mortgage payments to both mortgagees.  (Joint Stipulation ¶ 6.)

7.       On May 8, 2012, Brendan moved to dismiss Mrs. Neal's prior bankruptcy case

alleging both that Mrs. Neal was delinquent in her payments to the Chapter 13 Trustee and that

she was delinquent in her post-petition payments to it. (Joint Stipulation ¶ 7.)

8.       On June 4, 2012, Mrs. Neal's prior case was dismissed. (Joint Stipulation ¶ 8.)

**The Current Case**

9.       This bankruptcy case is a voluntary case which the Neals commenced on June 29,

2012. (Joint Stipulation ¶ 9.)

10.      As of June 29, 2012, the Neal's residence was encumbered by two mortgage liens,

including Brendan's junior lien. (Joint Stipulation ¶ 11; Trial Trans. 138:3-17.)

11.      This case is a joint case in which the Debtors' Chapter 13 Plan proposes to treat

Brendan as an unsecured creditor. (Debtors' Ex. F.)  The Neals filed an Adversary proceeding to

determine the secured status of Brendan (case number 12-AP-01594). (Joint Stipulation  ¶  11.)

The Court tried the merits of the case on October 28, 2013, and concluded that Brendan held an

allowed unsecured claim because the property value secured only the first mortgage.  (Joint

Stipulation ¶ 11.)

- 4 -

**Mr. Neal**

12.     Mr. Neal is self-employed. (Trial Trans. 152:4-6.) He owns a 100% interest in

Bossman Trucking Inc. (Joint Stipulation ¶ 13.) Mr. Neal owns a 2000 Mack CH613 (titled and

registered in Mr. Neal's name). (Joint Stipulation ¶ 13; Trial Trans. 154:21-24, 155:12.) This

truck is disclosed on Schedule B and is described as having over 321,000 miles and as having

had major engine repair and "some" body damage. (Movant's Ex. 1 at Schedule B.) There is no

evidence in the record to contradict that description.

13.     Bossman Trucking hauls goods in Chicago and the surrounding areas and

sometimes to destinations as far away as Michigan. (Trial Trans. 44:3-10.) Bossman Trucking

does not do long-hauls. (Trial Trans. 44:3-10.) Mr. Neal finds loads for his business by looking

at a "load board" which is a list of loads that vendors need transported. (Trial Trans. 155: 1417.)

14.     Bossman Trucking has an accountant by the name of Bobby Teague. (Joint

Stipulation ¶ 14; Trial Trans. 55:2-4.) Mr. Teague prepares corporate tax returns for Bossman

Trucking. (Joint Stipulation ¶ 14; Trial Trans. 55:2-4.)

15.     Bossman Trucking is a sub "S" corporation and made that election beginning in

2011. (Movant's Ex. 8 at Bates Number NEAL 89.)

16.     Bossman Trucking filed an income tax return in 2011. (Joint Stipulation ¶ 14;

Movant's Ex. 8.) The 2011 corporate return shows gross receipts of $49,488 and ordinary

income of $896. (Movant's Ex. 8 at Bates Number NEAL 89.) However, this return also shows

a depreciation deduction of $8,800. (Movant's Ex. 8 at Bates Number NEAL 89.) If the

depreciation deduction had not been taken, then the ordinary income cash flow shown on the

2011 corporate return would have been $9,696. (See, Movant's Ex. 8 at Bates Number NEAL 89.)

17.     Bossman Trucking filed an income tax return for the year 2012. (Trial Trans. 69: 15-20.) The 2012 corporate return shows gross receipts of $45,166 and ordinary income of $4,500. (Trial Trans. 69:15-20; Movant's Ex. 8 at Form 2012 1120S.) However, this return showed a depreciation deduction of $5,280. (Movant's Ex. 8 at Form 2012 1120S.) If the depreciation deduction had not been taken, then the ordinary income cash flow shown on the 2012 corporate return would have been $9,780, averaging $815 per month. (See, Movant's Ex. 8 at Form 2012 1120S.) The 2012 return was not due until April 15, 2013 (after this bankruptcy case was filed on June 29, 2012).

18.     Mr. Neal filed an individual income tax return in 2011. (See, generally, Movant's Ex. 9.) This return was prepared by Bobby Teague. (Movant's Ex. 9 at Bates Number NEAL 34.) This return showed total income of $12,087. (Movant's Ex. 9 at Bates Number NEAL 33.) If $12,087 were averaged over 12 months the result would be an average of $1,007.25 in income per month. (See, Movant's Ex. 9 at Bates Number NEAL 33.) However, $1,787 of the $12,087 was passive income resulting from depreciation. (Movant's Ex. 9 at Bates Number NEAL 37.) Exclusive of that depreciation, Mr. Neal's 2011 income cash flow would be $10,300. (See, Movant's Ex. 9 at Bates Number NEAL 33, 37.) If $10,300 were averaged over 12 months the result would be an average of $858.33 per month. (See, Movant's Ex. 9 at Bates Number Neal 33, 37.)

- 6 -

19.     Mr. Neal's Schedule I filed in this bankruptcy case disclosed $833.33 per month in business income (Movant's Ex. 1 at Schedule I), quite close to his average monthly cash flow (apart from depreciation) business income in the years 2011 and 2012.

20.     Since filing this bankruptcy case, Mr. Neal has earned gross income of approximately $3,900 per month. (Trial Trans. 139:5-8) He has expenses for insurance ($560 per month), parking ($225 per month), the "load board" ($39 per month), food ($100 per month), fuel ($1,800 per month), bank fees ($85) per month, tolls ($60 per month) and, use taxes ($100 per month). (Trial Trans. 139-144.)

21.     The total of the above expenses is $2,969. If $2,969 is subtracted from $3,900 the result is $931 per month, only about $75 per month more than his scheduled income.

**Mrs. Neal**

22.     Mrs. Neal is self-employed as a daycare provider. (Trial Trans. 126:25, 127:1-5.) She runs the daycare from the Debtors' residence. (Trial Trans. 127:3-5.) The business is not incorporated and owns no assets. (Trial Trans. 130:17-20.) Mrs. Neal is paid primarily by the State of Illinois. (Trial Trans. 129:16-17; 131:1-4.) When the Debtors filed this case, Mrs. Neal's sister was paying her $400 per month to watch the sister's son (Mrs. Neal's nephew). (Trial Trans. 149:11-23.) As of the date of the trial in this matter, that payment had been reduced to $200 per month. (Trial Trans. 149:15-17.)

23.     Mrs. Neal filed an income tax return in 2011. (Movant's Ex. 18.) Bobby Teague prepared that return on Mrs. Neal's behalf. (Movant's Ex. 18 at Bates Number NEAL 71.) Mrs. Neal's 2011 tax return shows total income of $13,287. (Movant's Ex. 18 at Bates Number NEAL 70.) However, $1,856 of that $13,287 was from W2 wages and Mrs. Neal was not still employed

- 7 -

as of June 29, 2012, by the employer that issued that W2. (Movant's Ex. 18 at NEAL 70; see, generally, Trial Trans.) Mrs. Neal's total business income in 2011 was $11,431. (Movant's Ex. 18 at Bates Number NEAL 70.) If that amount were averaged over 12 months the result would be $952.58 per month. (See, Movant's Ex. 18 at Bates Number NEAL 70.)

24.    Mrs. Neal's Schedule I discloses $1,083.33 per month in business income (Movant's Ex. 1 at Schedule I), about $130 more per month than her pre-bankruptcy income.

25.    At the trial of this contested proceeding, Mrs. Neal testified that her current monthly business income is somewhat higher at $1,480 per month. (Trial Trans. 131:1-4.)

26.    The Debtors' Schedule B discloses a life insurance policy on line 9. (Movant's Ex. 1 at Schedule B.) The life insurance is listed is a term policy. (Movant's Ex. 1 at Schedule B.) Mrs. Neal testified at the trial in this matter that the Debtors still own this policy and that they pay a premium of $35 per month on that policy. (Trial Trans. 135:22-25, 136:1-3.) No expense for life insurance is noted on the Debtors' Schedule J. (Movant's Ex. 1 at Schedule J.)

### Findings of Fact Proposed by Brendan
### and Adopted by the Court's as Additional Findings

27.    Although Debtor Emmitt Neal is the sole owner and president of a trucking business called Bossman Trucking, Inc, his business records are not always complete in detail.

28.    The Debtors prepared and delivered to the Chapter 13 trustee "Monthly Financial Reports" for Bossman Trucking, Inc. for the months of December, 2011 through May, 2012, which were each dated June 20, 2012.

29.     These reports, which purported to detail the expenses of Bossman Trucking, Inc. by various categories, did not include expenses for the expense categories "Security" and "Tolls," which were reported on the 2011 federal tax return for Bossman Trucking, Inc.

30.     During the six months prior to the filing of the debtors' bankruptcy petition on June 29, 2012, Bossman Trucking, Inc. maintained an account at US Bank from which Mr. Neal paid for some personal expenses, including occasional purchases for liquor, food, clothing, and pet supplies.

31.     Although Mr. Neal testified initially that all of Bossman Trucking's income was paid into the US Bank account, in November, 2011 and December, 2011, Mr. Neal also received deposits into a personal account at Charter One Bank from "BNSF Logistics Payables," which was income of Bossman Trucking, Inc.

32.     For the month of December, 2011, deposits into the US Bank account of Bossman Trucking, Inc. totaled $2,408.42, whereas the Monthly Financial Report of the trucking company for that month indicated larger income receipts totaling $3,345.00.

33.     For the month of January, 2012, deposits into the US Bank account of Bossman Trucking, Inc. totaled $7,946.60, whereas the Monthly Financial Report for that month indicated a smaller monthly income of $2,725.00.

34.     For the month of February, 2012, deposits into the US Bank account of Bossman Trucking, Inc. totaled $2,455.49, whereas the Monthly Financial Report for that month indicated income of $3,002.00.

35.    For the month of March, 2012, deposits into the US Bank account of Bossman Trucking, Inc. totaled $2,218.32, whereas the Monthly Financial Report for that month indicated income of $1,830.00.

36.    For the month of April, 2012, deposits into the US Bank account of Bossman Trucking, Inc. totaled $320.13, whereas the Monthly Financial Report for that month indicated income of $0.00.

37.    The debtors produced a statement of expenses entitled "Bossman Trucking Inc. Monthly Expenses," which shows monthly expenses for the business of $13,542.00, which is partially inconsistent with expenses shown on the Monthly Financial Reports of Bossman Trucking, Inc. for the months of December, 2011 through May, 2012, which showed, respectively, $1,850.00, $1,250.00, $2,375.00, $2,300.00, $1,700.00, and $1,650.00.

38.    Bossman Trucking, Inc.'s 2011 federal tax return indicated an annual expense of $3,100.00 for truck repair, whereas the "Bossman Trucking Inc. Monthly Expense" statement indicates a larger actual monthly expense for repairs.

39.    The "Bossman Trucking Inc. Monthly Expenses," statement did not include expenses for security, whereas this expense category appears on the business's 2011 federal tax return, in the annual amount of $1,400.00.

40.    Debtor Emmitt Neal also earned income from auto repair work performed as a sole proprietor, which appears on Mr. Neal's personal income tax returns for 2011 and 2012 as Business Income.

41.    Mr. Neal keeps no records of his income and expenses for his auto repair work.

- 10 -

42.     According to Mr. Neal's personal income tax returns for 2011 and 2012, Mr. Neal's auto repair work constituted most of his adjusted gross income.

43.     Mr. Neal's personal income tax return for 2012 showed annual adjusted gross income of $14,630.00, which is an average of $1,219 per month, whereas Schedule I of the debtors Petition in this case showed monthly income for Mr. Neal of $833.00.

44.     Debtor Paula Neal runs a day care business as a sole proprietor, but does not keep financial records for her business activities.

45.     During the period from December, 2011 through May, 2012, Mrs. Neal did not have a bank account.

46.     At the time of the filing of this case, Mrs. Neal had no auto loan expense, because the automobile loan on which she had co-signed was paid each month by her sister.

47.     Schedule J of the Petition lists an auto installment expense of $317 per month.

48.     The Debtors receive food stamps, but this income is not shown on Schedule I of the Petition.

49.     Mrs. Neal had filed a previous Chapter 13 bankruptcy, on September 30, 2011, Case No. 11 B 40061.

50.     Schedule I of the petition in Mrs. Neal's previous Chapter 13 bankruptcy, indicated regular monthly income of $1,546.87, whereas the Debtors' Schedule I in this case indicated regular monthly income for Mrs. Neal of $1,083.33.

51.     Mrs. Neal's personal income tax returns for 2011 and 2012, showed an increase in annual income from 2011 (during which she had net business income of $11,431.00) to 2012 (during which she had net business income of $15,003.00).

- 11 -

52.     The Debtors failed to disclose the following items in their bankruptcy Petition:
(1) a safe deposit box containing documents of title to property; (2) a whole life insurance trust,
of which Mr. Neal is a beneficiary; and (3) one time government assistance payments. The
Debtors received approximately $11,000 in federal assistance on account of an April, 2012, flood
that caused damage to the basement of the Debtors' principal residence. However, Mrs. Neal
previously testified in the Adversary Proceeding to strip-off Brendan's lien (12 A 01594) that
Debtors received only $700.00 on account of the April, 2012 flood.

53.     Mrs. Neal's previous Chapter 13 bankruptcy case had a confirmed plan that
scheduled Brendan as a secured creditor. Mrs. Neal's previous Chapter 13 bankruptcy case was
dismissed on June 4, 2012, on the motion of Brendan for failure to make payments. This
bankruptcy case was filed 25 days following dismissal of Mrs. Neal's previous Chapter 13
bankruptcy.

54.     Brendan's claim is for $52,781.64. Other unsecured debt shown in Schedule F of
the Petition totals $28,516.00, including a $17,000 debt to the Illinois Tollway. Proofs of Claims
filed on behalf of unsecured creditors other than Brendan total $8,422.40. The petition in Mrs.
Neal's previous Chapter 13 bankruptcy case scheduled just $4,056.00 in unsecured debt.

### ADDITIONAL FINDINGS

Additional facts set forth in the Conclusions of Law will stand as additional Findings of
Fact.

- 12 -

## CONCLUSIONS OF LAW

**Jurisdiction**

Jurisdiction lies over this objection to proof of claim under 28 U.S.C. § 1334. It is

referred here by Internal Procedure 15(a) of the District Court for the Northern District of Illinois.

This matter concerns an objection to a chapter 13 plan of reorganization, and is therefore a core

proceeding under 28 U.S.C. § 157(b)(2)(L). An objection to a plan of reorganization "stems from

the bankruptcy itself," and may constitutionally be decided by a bankruptcy judge. *Stern v.*

*Marshall*, 131 S.Ct. 2594, 2618 (2011).

**Good Faith**

Section 1325(a)(7) of the Bankruptcy Code requires that "the action of the debtor in filing

the petition was in good faith." 11 U.S.C. § 1325(a)(7). Under Seventh Circuit precedent,

> ". . . [i]n evaluating good faith necessary for the confirmation of a
> Chapter 13 plan, this court has refused to adopt a specific test or
> definition of good faith. Instead, this court has held that good faith
> is a term incapable of precise definition, and, therefore, the good
> faith inquiry is a fact intensive determination better left to the
> discretion of the bankruptcy court."

*Matter of Love*, 957 F.2d 1350, 1355 (7th Cir. 1992) (citing *In re Rimgale,* 669 F.2d 426, 431

(1982)).

"[T]he focus of the good faith inquiry under both Section 1307 and Section 1325 is often

whether the filing is fundamentally fair to creditors and, more generally, is the filing

fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's

provisions." *Matter of Love*, 957 F.2d 1350, 1357 (7th Cir.1992).

- 13 -

However, certain of the factors outlined in *Rimgale* have been supplanted by subsequent

amendments to the bankruptcy code. *See In re Smith* 848 F.2d 813, 820 (7th Cir. 1988)

(discussing good faith considerations superseded by changes to the bankruptcy code). Inquiry

into the re-payment percentage to unsecured creditors was one of these—it was replaced by the

requirement of Section 1325(b)(1)(B) that all of a debtor's disposable income be paid to

unsecured creditors. *Id.; In re Shafer*, 393 B.R. 655, 659 (W.D. WI 2008). But other factors

remain, including consideration as to whether the plan treats creditors "fairly." *See In re Smith*,

286 F.3d 461, 468 (7th Cir. 2002) (noting that courts have considered the accuracy of a debtor's

financial disclosures and records as important in determining whether a debtor has dealt fairly

with creditors).

The accuracy of schedules and statements of affairs is one of several factors to be taken

into consideration under the standard of "good faith" in the filing of a case, but it is a critical

factor. *In re Jongsma*, 402 B.R. 858, 873-75 (Bankr. N.D. Ind. 2009). The requirements of

§ 727(a)(4)(A) in a Chapter 7 case also can guide the analysis for determining whether the

accuracy of Chapter 13 schedules and statements comport with the good faith requirement

because the need for accurate disclosure is also necessary in a Chapter 13 case. *Id.* Section

727(a)(4)(A) provides that the court may not grant a debtor a discharge if: "(4) the debtor

knowingly and fraudulently, in or in connection with the case - (A) made a false oath or

account." § 727(a)(4)(A).

Disclosure of material assets is certainly required:

> The debtor must disclose all ownership interests he holds in
> property. The trustee and creditors are entitled to honest and
> accurate signposts on the trail showing what property has passed

- 14 -

> through the debtor's hands during the period prior to his
> bankruptcy. It is not the debtor's responsibility to decide which
> assets are to be disclosed to creditors; rather, his job is simply to
> address each question and answer it accurately and completely.

*Jongsma*, 402 B.R. at 873 (internal quotations omitted).

A party alleging that a debtor has violated his oath has to prove by preponderance of the

evidence that: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the

debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent;

and (5) the statement related materially to the bankruptcy case." *In re Stamat*, 635 F.3d 974, 978

(7th Cir. 2011).

For purposes of § 727(a)(4), a debtor's petition and schedules, statement of financial

affairs, statements made at a § 341 meeting, and testimony at a Rule 2004 examination all

constitute statements that are made under oath. *In re Broholm, 310 B.R. 864, 879 (Bankr. N.D.*

*Ill. 2004)*. Filing false schedules with material omissions or representations with intent to mislead

creditors constitutes a false oath under § 727(a)(4).

Fraudulent intent may be proven by a showing of reckless disregard for the truth. *Stamat*

*v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011). "[A]lthough not every single item of assets need be

scheduled and valued, there comes a point when the aggregate errors and omissions cross the line

past which a debtor's discharge should be denied." *In re Stamat*, 395 B.R. 59, 74 (Bankr. N.D. Ill.

2008) (internal quotation omitted). "The cumulative effect of a number of false oaths by the

debtor with respect to a variety of matters establishes a pattern of reckless and cavalier disregard

for the truth by the debtor." *Id.*

Finally, the objecting creditor must show that false statements made by the debtor relate materially to the bankruptcy case. A statement is considered material for purposes of § 727(a)(4) if it relates to the debtor's estate, involves the discovery of assets, or concerns the disposition of the debtor's property or his entitlement to discharge. *Id.*

**The 2012 Tax Returns Are Relevant
to the Debtors' Income and Expenses**

The Debtors argue that information in the 2012 tax returns should not be compared to information on their schedules. All that really matters, they say, is that the disclosures on bankruptcy Schedules I and J are substantially consistent with their 2011 returns and thereby shows their honest reporting. However, the relevant period for determining the Debtors' disposable income is the six months prior to the petition filing date (June 29, 2012), a period mostly in the year 2012. Therefore, the Debtors' assertion that "only the 2011 tax returns bear on the accuracy of Mr. Neal's reported income" must be rejected. However, as shown, the information at the time of the bankruptcy filing (many months before the 2012 tax return was filed) was reasonably close to information reported on the subsequent return. (*See* Findings No. 17.)

**The State of the Debtors' Financial
Records Is Relevant to Confirmation**

The Debtors' business income and expenses matter, because they derive all of their income from business self-employment. Brendan argues that there is no way of determining whether the debtors' Schedule I and J are accurate if the Debtors, and Mr. Neal in particular cannot with full accuracy account for the income and expenses of his self-employment activities. Consideration of the Debtors' financial records is part of the inquiry. *In re Shafer*, 393 B.R. at

- 16 -

659; *In re Smith*, 286 F.3d at 468. Here, the Debtors filed tax returns with use of an accountant,

and used bank accounts as records of their income. However, they lack any of their own internal

financial records that would be found in well run businesses operated by sophisticated business

people. They have bank statements for a business account for Bossman trucking, but no bank

statements relating solely to Mr. Neal's auto repair business, or relating solely to Mrs. Neal's

child care business. They do have records, but both personal and business expenses are paid out

of a single account and it is not easy to sift out business and personal expenses.

The Debtors argue that their failure to include on their schedules a safe deposit box,

whole life insurance policy, and income from food stamps, should be analyzed as a "liquidation"

objection under 11 U.S.C. § 1324(a)(4). However, omission of these items from the schedules is

relevant in considering the totality of circumstances. Debtors also admit in their *Closing*

*Argument*. *See Debtors' Closing Argument*, p. 16 that auto expense and mortgage payment listed

on Schedule J were not accurate. The inaccuracies of the schedules are said by Brendan to be

compounded by the Debtors' trial testimony, which, both before this court and in deposition

showed some inconsistencies and errors. *See e.g.* Trial Trans. 46:13-15, 48:7-14 (Mr. Neal's

testimony that he had never employed anyone to drive Bossman Trucking, Inc.'s truck was

inconsistent with his deposition testimony); Trial Trans. 74:7-25 (Mr. Neal's inaccurate

testimony that Bossman Trucking, Inc. had no net annual income for 2011 and 2012, and that in

an average month it operated at a loss was contrary to the Bossman Trucking, Inc. 2011 and 2012

tax returns and the financial reports produced by Debtors (Brendan Exhibit 5)); Trial Trans.

77:1-12 (Mr. Neal's testimony that no personal expenses were paid out of Bossman Trucking,

Inc.'s business account was contradicted by the account records (Brendan Exhibit 10) and Mr.

- 17 -

Neal's subsequent testimony). Other evidence arguably gave rise to concern whether Debtors

improperly took some expenses as business expenses: Trial Trans. 83:20-25, 84:1-4 (Mr. Neal's

testimony that personal items for the Debtors' home, purchased at a liquor store, were a business

expense); 85:5-18 (Mr. Neal's testimony that purchase of dog food at a pet store was a business

expense related to "security" however, may relate to use of a watchdog). (Mrs. Neal's testimony

acknowledging her prior inaccurate testimony in an adversary proceeding related to

compensation received from the federal government for flood damage). Trial Trans. 119:23-25,

120:1-5. However, the inconsistencies and omissions in recordkeeping are entirely consistent

with the debtors being honest but unsophisticated. This Court finds that the Debtors have been

credible in their testimony about their financial history. That they are unsophisticated is an

uncontested fact.

This picture has raised concerns and made this a close case. But it is a picture that is

similar to what has been found in cases of many Chapter 13 debtors in business that have been

reviewed in this Court. Chapter 13 business debtors raise serious questions when they lack

business training and precise organized records. But while these Debtors have some

contradictions in their record keeping, they have reliable bank deposit records and filed tax

returns that have not been shown to be unreliable. The schedules showed net income

substantially close to those sources, and it has not been proven that they either understated value

of any assets or failed to schedule net income available to pay creditors more through their Plan.

That conclusion, when added to the credibility of the individuals in their struggle to save their

home and run businesses without proper training have lead to the ultimate finding below that

they filed their Plan in good faith.

## DISCUSSION

"It is the bankruptcy court's duty to evaluate the good faith of the plan under

§ 1325(a)(3)." *Rimgale v. Ravenot*, 699 F.2d 426, 431 (7th Cir. 1982); *Smith v. State of Indiana*,

848 F.2d 813 (7th Cir. 1988). In determining whether a plan has been proposed in good faith, the

court "must consider the [debtors'] entire circumstances . . . *Id.* Brendan wants the Court to find

and conclude (1) that the Debtors' have not stated their income or expenses accurately in the

Petition; and (2) that the percentage repayment proposed in the Plan to unsecured creditors is not

accurate, due to the Debtors' inaccurate and unreliable status of income and expenses in the

Petition and Schedules. It seeks a ruling that the Debtors' Chapter 13 Plan was not proposed in

good faith as required by § 1325(a)(3) of the bankruptcy code, and therefore the confirmation of

the pending plan should be denied. 11 U.S.C. § 1325(a)(3); *see Rimgale*, 426 at 432; *Smith*, 848

F.2d 813.

However, the rebuttal argument by counsel for Debtors is otherwise persuasive. The full

picture shows that some record keeping by Debtors was sloppy and the record of errors had to be

seriously considered. However, the lack of Debtors' sophistication and business experience,

coupled with absence of any demonstrated intent to deceive creditors or hide income or property

value from the creditors persuades the Court to rule for Debtors. "One of the primary

purposes of the Bankruptcy Act is to relieve the honest debtor from the weight of oppressive

indebtedness, and permit him to start afresh free from the obligations and responsibilities

consequent upon business misfortunes." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)

(internal quotation omitted).

- 19 -

## Brendan Has Failed To Meet Its Pleaded Burden

Despite the many details showing Debtors' lack of careful record keeping, Brendan has not shown that property was hidden or that Debtors have materially understated their ability to make monthly payments on their Plan.

Brendan's Amended Objection to confirmation made three broad objections to the Debtors' plan. First, that Mr. Neal's truck is worth more than what is listed in the Schedules. Second, that Mr. Neal's income and expenses are not stated correctly. Third, that Mrs. Neal's income and expenses are not correctly stated.

In its written closing argument filed with this Court, Brendan abandoned any argument that Mr. Neal's truck is worth more than what is listed in the Schedule B. In fact, Brendan's attorney failed to even ask about this truck during his examination of either Debtor.

Brendan relies primarily on the Seventh Circuit's decision in *Rimgale v. Ravenot* (669 F.2d 426 (1982)) in its attempt to convince this Court to sustain its objection.

*Rimgale* was decided more than two decades before the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) amendments of 2005. While *Rimgale* is still controlling law in the Seventh Circuit its impact has been limited by enactment of the BAPCPA amendments. *See In re Shafer*, 393 B.R. 655 (W.D. Wis. 2008) (discussing *Rimgale* after the BAPCPA amendments). The applicable factors are addressed in turn below and as to each the Court must conclude that Brendan has failed to meet its burden.

- 20 -

1.    **The Debtors Did Not Materially Understate Their Income**

(a)    **Mr. Neal**

Mr. Neal is self employed as a truck driver, paid by the load. Mr. Neal discloses $833 per month in net business income on his Schedule I. Brendan relies on the question as to where Mr. Neal had his income deposited. (See, e.g. Trial Trans. 19:19-23, 77-82.) Where the income was deposited is much less important than the fact that his Schedule I accurately reflects Mr. Neal's projected monthly income. Brendan complains about inconsistencies between Mr. Neal's "monthly financial reports" and the bank statements that he produced. (Trial Trans. 49-52.) The "monthly financial reports" concerned prior months,[1] while Schedule I was a projection of the Debtor's future income. Moreover, the demonstrated inconsistencies did not show that Debtors' schedules and the resulting net income represented to be available for Plan payments were materially inaccurate.

When this case was filed in June of 2012, Debtor relied on his 2011 tax return to project monthly income on his schedules. Mr. Neal employs an accountant (Bobby Teague) to prepare and file both his corporate and individual income tax returns. Brendan made no attempt to attack the accuracy of the 2011 corporate and individual tax returns; and the bankruptcy schedules largely relied on them.

Bossman Trucking's 2011 corporate return shows ordinary business income of $896. However, there is a deduction of $8,800 for depreciation. (Movant's Ex. 8 at Bates Number NEAL 89.) If the $8,800 depreciation were added back in to the $896 ordinary income, the business would have had net income of $9,696. If net income of $9,696 were divided over twelve

---

[1] They date from December 2011 through May 2012.

months then the monthly net income would be $808. Eight Hundred Eight Dollars is extremely close to the $833 listed on Mr. Neal's Schedule I.

Brendan further argues that Mr. Neal fails to disclose income he receives from work as a mechanic. The only support that Brendan offers for that proposition is the assertion that this income appears on Mr. Neal's individual tax return as "business income" on line 12. While not made explicit, Brendan is arguing that the income on line 12 of Mr. Neal's personal return is from work as a mechanic and the income on line 17 of Mr. Neal's personal return is from Bossman Trucking. Implicit in this argument is the understanding that Bossman Trucking does not pay tax but rather that the income tax liability passes through to Mr. Neal personally. Bossman Trucking has elected to be taxed as an "S" corporation and its tax liability does pass through to Mr. Neal personally. (Movant's Ex. 8 at Bates Number NEAL 89.)

However, the income on lines 12 and on line 17 of Mr. Neal's personal return was not shown to be from a separate business. The $1,787 noted on line 17 of Mr. Neal's individual 2011 income tax return is the passive income from the corporation's Schedule K. (Movant's Ex. 8 at Bates Number NEAL 94.) That fact is also noted in Schedule E part II of Mr. Neal's individual 2011 income tax return. (Movant's Ex. 9 at Bates Number NEAL 37.) Thus, the $1,787 on line 17 of Mr. Neal's individual return is not separate income.

Thus, the only difference that is left unaccounted for is the difference between the $9,696 noted above and the $10,300 actual income noted in line 12 of Mr. Neal's individual 2011 tax return. That $604 difference is small, and if averaged out over twelve months represents $50.33 per month. If that $50.33 were added in to the $808 noted above then Mr. Neal's monthly income

would be $858.33. This is not materially different from the $833.33 that Mr. Neal included in his
Schedule I.

When the documents and testimony are considered together, Debtors' inconsistencies are
small. The 2011 corporate tax return shows gross receipts of $49,488 and the 2012 corporate
return shows gross receipts of $45,166. The Debtors testified at trial that the then current gross
income of the trucking business is $3,900 per month (which is $46,800 per year). Their
testimony was credible and consistent with their tax returns and Schedule I.

It is therefore found that Mr. Neal disclosed his projected available monthly income on
his Schedule I with material accuracy.

### (b)   Mrs. Neal

Mrs. Neal runs a daycare business out of the Debtors' residence. Mrs. Neal has not
incorporated her business. She receives the majority of her income from the State of Illinois.
Mrs. Neal credibly testified that her income varies from month to month depending upon how
many children she is responsible for and upon how many hours each child is in her care.

She disclosed monthly business income of $1,083.33 on her Schedule I. Mrs. Neal's
individual 2011 income tax return disclosed annual net business income of $11,431. If this
amount were averaged over twelve months the result would be $952.58 per month, which is less
than what was listed on her Schedule I.

Mrs. Neal testified at trial that she could not remember exactly what her business income
was in June of 2012 when the bankruptcy case was filed. However, she credibly testified that her
current average monthly income from the operation of her business is $1,480. She further

- 23 -

credibly testified that she receives $740 per month from the State of Illinois which she must

spend on food for the children in her daycare, and which therefore is not income to her.

Mrs. Neal also testified that in June of 2012 her sister was giving her $400 per month to

watch her sister's son. Mrs. Neal testified that this amount has since been reduced to $200 per

month because that particular child is not spending as much time at the daycare.

It is found and held that Mrs. Neal disclosed her projected income on her Schedule I with

material accuracy.

## 2.    The Debtors' Business Expenses Are Not Materially Misstated

Brendan argued possible discrepancies as to various business expenses. However, the

Debtors did not list business expenses on their Schedules I and J, but rather listed net business

income on those Schedules. Indeed, Official Schedule J Form does not contain any place to

itemize business expenses, although business debtors may attach some summary of business

expenses.

In Brendan's discussion of its Exhibit 6, which Brendan contends is a fictional financial

record created after the fact, it's counsel has not shown how this exhibit was used (if at all) in

constructing the Schedule J nor did Brendan question the Debtors about this document at trial.

The fact that Exhibit 6 is "utterly at odds" with the "monthly financial reports" is relevant but did

not show that the bankruptcy schedules were inaccurate.

To illustrate what it contended was inaccuracy of the bankruptcy schedules, Brendan

argued that Bossman Trucking's corporate tax return showed an itemized deduction for tolls, but

that the Debtors' "monthly financial reports" show no such expense. However, the "monthly

financial reports" do not contain a line item for tolls that Mr. Neal could have filled in.

- 24 -

Moreover, the "monthly financial reports" were prepared by the unsophisticated Debtors whereas the tax returns were prepared by an accountant and Brendan made no attempt to attack accuracy of the tax returns.

As the objecting party, Brendan had the burden to show that the Debtors' scheduled business income and expenses were inaccurate. Brendan has failed to carry its burden to show material inaccuracies on the schedules. Materiality in this case would require a demonstration that Debtors hid their financial ability to pay significantly more on their Chapter 13 Plan to the creditors, but that has not been proven.

### 3.    The Debtors' Schedule J

The Debtors' Schedule J does not contain material inaccuracies as to cause a conclusion that their Plan is not confirmable.

Mrs. Neal acknowledged that she does not pay $317 for an auto but her sister makes that payment. This difference, however, is offset by the fact that Mrs. Neal pays $219 per month for vehicle insurance and by the fact that her mortgage payment is $450, as opposed to the $320 listed on the Schedule J.

The remainder of Brendan's argument focuses on the Debtors' business expenses. However, as previously outlined, the Debtors' net monthly income as listed on their Schedule I, is close to their net income as reported on their income tax returns.

### 4.    The Debtors' Plan Complies with Requirements of Section 1325(a)(4)

Brendan argues that the Debtors' are not meeting the liquidation analysis of Section 1324(a)(4). The *Rimgale* requirement that the percentage of repayment be correct has been overruled by statute. *See 11 U.S.C. § 1325(b)* and *In re Jongsma*, 402 B.R. 858, 870 (N.D. IN

2009). The issue under mandates of Section 1324(a)(4) is whether Plan payments to be

distributed are not less than payments would be in a Chapter 7 case. Brendan does not argue tat

Debtors' projected Plan payments fail to meet that test.

### 5.    **Miscellaneous Issues**

#### (a)    **The safe deposit box**

There is no safe deposit box listed on the Debtors' Statement of Financial Affairs (line

12). However, Mr. Neal did identify the contents of the box. (Movant's Ex. 13.) The box

contains paperwork for his grandmother which Brendan does not contend is property of the

estate. (Movant's Ex. 13.) The safe deposit box also contains a title. (Movant's Ex. 13.) This

evidence was elicited by Brendan at Mr. Neal's 2004 exam and Brendan failed to ask to what

property the title pertained. Brendan similarly failed to ask this question at the trial of this matter.

Brendan has not shown, even implicitly, that this title is to property not listed on the Debtors'

petition to which the Debtors' have a right or interest.

#### (b)    **Whole life insurance**

Mr. Neal testified at his Rule 2004 exam that he had a term life insurance policy.

(Movant's Ex. 13.) A term life insurance policy is noted on the Debtors' Schedule B. (Movant's

Ex. 1 at Schedule B.) Mr. Neal also testified at his Rule 2004 exam that he is the beneficiary of a

whole life insurance policy. (Movant's Ex. 13.) However, Mr. Neal also testified that this policy

is held by a revocable trust. (Movant's Ex. 13.) Therefore, his right to payment is contingent

upon both the death of the policy owner and upon the policy owner not changing the beneficiary

election prior to his or her death. It did not follow that Mr. Neal has any present right or

necessary expectation of payment on this policy during the pendency of a Chapter 13 Plan. In

- 26 -

fact, Mr. Neal testified at the trial in this matter that the policy had lapsed. (See, Trial Trans. 86:25, 87:1-25.)

### (c) Governmental assistance payments

Brendan argues, but did not establish, this couple with three children who are on food stamps can afford to pay more than the $375 in Plan payments. The Debtors are under the applicable median income, and are in a 60 month repayment Plan in order to cure the arrearage on their first mortgage and to repay a projected 13% of their other debts.

### 6. "Fairness" to Brendan

Brendan contends that the Debtors' plan is fundamentally unfair to Brendan. The *Rimgale* "requirement" of "fairness" has been supplanted by the BAPCPA amendments. *See Jongsma,* 402 B.R. at 869.

One purpose of filing this Plan was to avoid the junior mortgage lien held by Brendan. A Debtor's ability to strip a lien through a Chapter 13 plan is a well-recognized right. *E.g. In re Okosisi*, 451 B.R. 90, 93-94 (Bankr. D. Nev. 2011) (noting that this has been the result in "each of the six circuits that have considered this question"). It cannot be unfair for the Debtors here to have exercised their rights under law.

### CONCLUSION

Brendan's Amended Objection to Confirmation will by separate order by overruled. The Debtors have with material accuracy disclosed their income, expenses, and assets. The Debtors did not hide assets or income and are committing all of their disposable income to their Plan. Brendan's Objection and proof, and the sometime careless record keeping by debtors, is of

concern but do not warrant the dire consequences to Debtors that would result from sustaining

the Objection.  It will be denied and Debtors will retain their chance to save their home and make

a fresh start by completing their Plan.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ____ day of April 2014.

In re: Emitt Neal, Jr. & Paula Neal
Bankruptcy Case No. 12 B 26305

## CERTIFICATE OF SERVICE

I, Deborah Smith, certify that on April 0, 2014, I caused to be mailed by United States first class mail
copies of the foregoing ORDER to the following, and class filed for service by CM/ECF e-mail

_Deborah Smith_

Deborah Smith, Courtroom Deputy

## Electronically Served through CM/ECF System

Ashley Chike
Geraci Law L.L.C.
55 E. Monroe St. Suite 3400
Chicago, IL 60603
Email: ndil@geracilaw.com

Trustee
Tom Vaughn
55 E. Monroe Street, Suite 3850
Chicago, IL 60603

U.S. Trustee
Patrick S Layng
Office of the U.S. Trustee, Region 11
219 S Dearborn St
Room 873
Chicago, IL 60604

Christine Thurston
24 East Avenue
Riverside, IL 60546
Attorney for Brendan Financial, Inc

## Service through regular first class

Debtor(s)

Emmitt Neal, Jr.

Paula Neal

1206 S 1st Ave

Maywood, IL 60153